### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DIEGO LEANDRO VELASQUES RINCON, | ) ) ) |
| Petitioner, | ) ) |
| v. | ) ) |
| PATRICIA HYDE, et al., | ) ) |
| Respondents. | ) ) ) |

Civil Action No.
25-12633-BEM

### MEMORANDUM AND ORDER ON
### PETITION FOR WRIT OF HABEAS CORPUS

**MURPHY, J.**

For nearly four years, Petitioner Diego Leandro Velasquez Rincon lived freely and lawfully in the United States, having been paroled upon an immigration judge's finding that he had a credible fear of persecution or torture if returned to his native Colombia. However, on August 13, 2025, Petitioner was re-detained by United States Immigration and Customs Enforcement ("ICE") following an unrelated court appearance. By the authority purportedly relied upon for his detention, Petitioner has no right to a bond hearing, meaning that he is to be detained without the possibility of release until the conclusion of his still-ongoing asylum proceedings, an administrative process that can drag on for years due, in part, to a growing backlog of such cases.[1]

---

[1] "Individuals with an immigration court case who were ultimately granted relief such as asylum in FY 2024 waited more than 1,283 days on average for that outcome." *Asylum in the United States*, AM. IMMIGR. COUNCIL (May 9, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/asylum-united-states/ [https://perma.cc/HZ2P-FMN8]; *see also Immigration Court Quick Facts*, TRANSACTIONAL RECS. ACCESS CLEARINGHOUSE, https://tracreports.org/immigration/quickfacts/eoir.html (last visited Nov. 7, 2025) [https://perma.cc/555T-3R7X] (showing that, as of August 2025, 2,271,857 were awaiting asylum hearings).

Typically, such executive detention without recourse to an individualized hearing and a neutral decisionmaker would raise serious due-process concerns. That is because, "[i]n our society liberty is the norm, and detention . . . without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Due Process Clause applies to all "'persons'" within the "geographic borders" of the United States. *Id.* at 693 (quoting *Plyler v. Doe*, 457 U.S. 202, 210 (1982)). Thus, even in the immigration context, government detention in the United States is permissible "only 'in certain special and narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Kong v. United States*, 62 F.4th 608, 616 (1st Cir. 2023) (quoting *Zadvydas*, 533 U.S. at 690)).

Notwithstanding, Respondents argue that detention can be maintained without any consideration of the Due Process Clause because of a legal fiction—the so-called 'entry fiction doctrine'—which disregards the objective reality of a non-citizen's physical presence in the United States and instead pretends that the individual has been "stopped at the border" and never permitted to enter. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). The entry fiction doctrine is indeed a venerable rule standing in service of Congress's "sovereign prerogative . . . to decide which aliens to admit." *Id.* (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)). Without it, for example, any non-citizen landing at an international airport would acquire constitutional protections over his admission to the United States no later than when his aircraft touched the ground. *Id.*

But the Supreme Court has never applied the entry fiction doctrine to a case like this—to constitutionally justify the detention of a person living freely, for years, within the United States—and its expansion here cannot be justified. "The proper use of legal fiction is to prevent injustice." *Union Refrigerator Transit Co. v. Commonwealth of Kentucky*, 199 U.S. 194, 208 (1905) ("*[I]n fictione juris semper aequitas existit.*" (quoting 3 William Blackstone, *Commentaries* \*43) ["Within a legal fiction, equity always resides."]). Pretending that Petitioner never entered the United States not only subordinates fact to fiction, it disregards the plain meaning of the Due Process Clause, which promises its protection to every "person" within the United States. U.S. CONST. amend. V.

To be sure, this has always been, to some degree, the effect of the entry fiction doctrine. *See, e.g.*, *Thuraissigiam*, 591 U.S. 103, 138–40 (holding that a non-citizen could not challenge on constitutional due-process grounds the procedure that determined his admission to the United States, even though he was detained twenty-five yards *past* the southern border). But those cases reflect a pragmatic and functional balance between two legal absolutes *not* in tension here—the Constitution's foundational prohibition against "arbitrary governmental action," *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992), and "the 'sovereign prerogative' of governing admission to this country," *Thuraissigiam*, 591 U.S. at 140 (quoting *Plasencia*, 459 U.S. at 32). Granting Petitioner a bond hearing does not "undermine" Congress's authority over his admission process. *Cf. Thuraissigiam*, 591 U.S. at 140. After a bond hearing—which may or may not result in his release from detention—Petitioner will be subject to the same removal proceedings as before, with no new right to remain. A bond hearing is the very procedure laid out in statute and in regulation for closely situated individuals. It leaves the determination of whether Petitioner poses a flight risk

or a danger to his community in the competent hands of the immigration court.  In short, it is a minimal imposition to ensure that Petitioner's detention remains tethered to its lawful purpose.

Accordingly, for these reasons and for those stated below, the Court will grant the Petition in part and order that Petitioner receive a bond hearing to consider the merits of his release.

## I.     Background

### A.     Factual Background

Petitioner is a native and citizen of Colombia.  Dkt. 8-1 ¶ 6.[2]  On December 8, 2021, Petitioner entered the United States near Eagle Pass, Texas, without having been inspected, admitted, or paroled.  *Id.* ¶ 7.  That same day, he was encountered and detained by U.S. Customs and Border Patrol ("CBP").  *Id.*  The following day, CBP issued Petitioner a Notice and Order of Expedited Removal, under 8 U.S.C. § 1225(b)(1) ("section 1225(b)(1)"), alleging that Petitioner was inadmissible for not being in possession of a valid entry document.  *Id.* ¶ 8.  Petitioner, however, indicated a fear of return to Colombia and was thereupon referred for a credible fear interview.  *Id.*; *see also* 8 U.S.C. § 1225(b)(1)(B)(i).

On January 10, 2022, an immigration judge found that Petitioner's fear was credible, vacating a prior negative finding made by an immigration officer.  Dkt. 8-1 ¶¶ 9–11.  As a result, on January 20, 2022, ICE issued Petitioner a Notice to Appear in immigration court, initiating full removal proceedings under 8 U.S.C. § 1229a ("section 1229a"), through which Petitioner would be able to make his claim for asylum.  *See id.* ¶ 12; 8 C.F.R. § 208.30.[3]  On January 22, 2022, ICE

---

[2] The relevant facts are not in dispute.

[3] ICE's filing of a Notice to Appear automatically vacated Petitioner's Order of Expedited Removal.  *See* Dkt. 8-1 ¶ 12.  Petitioner argues that, "[o]nce the expedited removal order [wa]s vacated, the legal basis for applying the mandatory detention component of [section 1225] cease[d] to exist."  Dkt. 12 at 8.  For the reasons stated in Section II(A), *infra*, the Court disagrees.

released Petitioner on parole under 8 U.S.C. § 1182(d)(5)(A) ("section 1182(d)(5)(A)") and a monetary bond of $1,500.[4]  Dkt. 8-1 ¶ 13.

Since then, Petitioner has twice been arrested: in February 2024, in Washington D.C., for destruction of property; and in August 2025, in Revere, Massachusetts, on misdemeanor drug charges. *Id.* ¶¶ 14–15; Dkt. 1-1 at 8.[5]  After being arraigned and released for the latter, on August 13, 2025, Petitioner was detained by ICE at the Chelsea District Court.  Dkt. 8-1 ¶ 16–17.

### B.  Procedural Background

On September 11, 2025, Petitioner requested that an immigration judge conduct a custody redetermination hearing. *Id.* ¶ 18.  On September 17, 2025, anticipating denial, Petitioner sought a writ of habeas corpus in this Court.  Dkt. 1.  The next day, the immigration judge indeed denied review of Petitioner's custody status, finding him ineligible under section 1225.  Dkt. 8-1 ¶ 19.

On September 23, 2025, Respondents opposed the Petition.  Dkt. 8.  The Court then ordered a response.  Dkt. 9.  Petitioner so answered and amended his Petition.  Dkts. 11–12.  On October 21, 2025, the Court held a hearing and took the matter under advisement.  Dkt. 14.

---

[4] At the October 21, 2025 hearing, the Court inquired into the precise nature of Petitioner's January 2022 release.  ICE records, submitted by Petitioner, stated that Petitioner had been released on an Order of Recognizance, seemingly under 8 U.S.C. § 1226 ("section 1226"). *See* Dkt. 1-1 at 8.  However, Respondents' declarant reported that Petitioner had been released on interim parole under section 1182(d)(5)(A). *See* Dkt. 8-1 ¶ 13.  After the hearing, Respondents submitted the original Notice, confirming their position. *See* Dkt. 15-1.

[5] The record here is less than clear.  Neither party indicates the ultimate disposition of the D.C. arrest. Dkt. 8-1 ¶ 14; Dkt. 12 at 10.  As to the August 2025 arrest, Respondents' declarant states that it was for (felony) possession of a class A substance, Dkt. 8-1 ¶ 15, but their brief, as well as ICE records submitted by Petitioner, state that the arrest was for (misdemeanor) possession of a class B substance.  Dkt. 1-1 at 8; Dkt. 8 at 3; *see also* Mass. Gen. Laws ch. 94C, § 34.  The difference is not necessarily relevant here but may, of course, have implications for Petitioner's underlying immigration case or for the merits of any ultimate request for release.

## II.    Discussion

### A.    Statutory Framework

The Court largely agrees with Respondents' (and the immigration judge's) framing of the statutes.  Petitioner's initial detention and expedited removal order were done pursuant to section 1225(b)(1).  *See* Dkt. 8-1 ¶ 8.  The Court concludes, as a matter of statute, that Petitioner continues to be detained under that authority without recourse to a bond hearing.

#### 1.    Detention

In *Jennings v. Rodriguez*, 583 U.S. 281 (2018), the Supreme Court explained that an individual detained under section 1225(b)(1) remains detained under that provision "throughout the completion of applicable proceedings."[6]  *Id.* at 303.  Here, the "applicable proceedings" are Petitioner's removal proceedings under section 1229a, wherein Petitioner is receiving "'further consideration of [his] application for asylum.'"  *See id.* at 297 (quoting 8 U.S.C. § 1225(b)(1)(B)(ii)).  Thus, Petitioner's detention continues to be governed by section 1225(b)(1), notwithstanding his case's transfer from expedited removal into section 1229a proceedings.[7]

#### 2.    Parole

Following the immigration judge's determination that Petitioner had a credible fear of persecution or torture if returned to Colombia, Petitioner was paroled into the United States under

---

[6] The Attorney General formally adopted the Supreme Court's interpretation in *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019).

[7] Petitioner cites two prior decisions by this Court, *Diaz Martinez v. Hyde*, — F. Supp. 3d —, 2025 WL 2084238 (D. Mass. July 24, 2025), and *Aguiriano Romero v. Hyde*, — F. Supp. 3d —, 2025 WL 2403827 (D. Mass. Aug. 19, 2025), to argue that his detention is instead governed by section 1226. Dkt. 12 at 9–10. Those cases dealt with a different fact pattern—a non-citizen *initially* (and, in this Court's view, correctly) detained and subsequently released under section 1226, whom the Government later sought to detain under section 1225. *See Diaz Martinez*, 2025 WL 2084238, at *3; *Aguiriano Romero*, 2025 WL 2403827, at *8 ("Petitioner has always been treated by Respondents as subject to discretionary detention under section 1226, rather than mandatory detention under section 1225."). In this case, Petitioner has not challenged either his initial amenability to expedited removal or to the propriety of his then-detention under section 1225 while that order was in effect. *See* Dkt. 12 at 5. Accordingly, the Court assumes that Petitioner was correctly processed under section 1225 when he arrived in December 2021.

section 1182(d)(5)(A).  Dkt. 8-1 ¶ 13.  Such may be done at the discretion of the Department of

Homeland Security ("DHS") for either "urgent humanitarian reasons or significant public benefit."

8 U.S.C. § 1182(d)(5)(A).  Parole into the United States under section 1182(d)(5)(A), however, is

done subject to a reservation of rights by the Government.  *See Diaz Martinez v. Hyde*, — F. Supp.

3d —, 2025 WL 2084238, at *3 (D. Mass. July 24, 2025) (explaining the difference between

"conditional parole" under section 1226 and "parole into the United States" under section

1182(d)(5)(A).  In particular, parole under section 1182(d)(5)(A) is expressly "not [to] be

regarded as an admission" to the United States.[8]  8 U.S.C. § 1182(d)(5)(A).  Moreover,

> when the purposes of such parole shall, in the opinion of the Secretary of Homeland
> Security, have been served the alien shall ***forthwith return or be returned to the
> custody from which he was paroled*** and thereafter his case shall continue to be
> dealt with in the same manner as that of any other applicant for admission to the
> United States.

*Id.* (emphasis added); *see also* 8 C.F.R. § 212.5(e)(2)(i) (2025) (providing that, when parole is

terminated, the non-citizen "shall be restored to the status that he or she had at the time of parole").

"Accordingly, an alien detained under [section 1225(b)] who is released from detention pursuant

to a grant of parole under [section 1182(d)(5)(A)], and whose grant of parole is subsequently

terminated, is returned to custody under [section 1225(b)] pending the completion of removal

proceedings."  *Matter of Q. Li*, 29 I. & N. Dec. 66, 70 (BIA 2025).[9]  Thus, when Petitioner's parole

was revoked upon ICE's filing of a Notice to Appear, *see* 8 C.F.R. § 212.5(e)(2)(i), "[he] was

---

[8] In this context, "admission . . . mean[s], with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).  As such, "admission" is notably distinct from simple "entry," which might be lawful or unlawful.

[9] Courts must exercise "independent judgment."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024).  Nevertheless, the reasoned decisions of immigration courts may be considered as helpful guidance.  *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)).

required to 'forthwith return or be returned to the custody' under [section 1225(b)] 'from which [he] was paroled.'" *See Matter of Q. Li*, 29 I. & N. Dec. at 70 (quoting 8 U.S.C. § 1182(d)(5)(A)).

### 3. Bond

Parole into the United States under section 1182(d)(5)(A) is, statutorily speaking, the only mechanism by which an individual detained under section 1225(b) may be released. *Jennings*, 583 U.S. at 300 ("That express exception to detention implies that there are no *other* circumstances under which aliens detained under § 1225(b) may be released." (emphasis in original)). Thus, the detention statutes provide that Petitioner must be detained without a bond hearing, absent another grant of parole. *See id.* at 297 ("§1225(b)(1) . . . says [no]thing whatsoever about bond hearings.").

### B. Constitutional Issues

The *Jennings* majority, however, declined to address the detention scheme's constitutionality. *Jennings*, 583 U.S. at 312 (remanding those arguments for further consideration).[10] It did so notwithstanding three justices' "'grave doubts' about the statute's constitutionality," *id.* at 330 (Breyer, J., dissenting) (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916)), sentiments shared by this Court.

### 1. Applicability of the Due Process Clause

Relying heavily on the Supreme Court's decision in *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020), Respondents argue that Petitioner lacks constitutional due-process protections with respect to his detention because he has never been admitted into the United States and thus remains an "applicant for admission" under the immigration statutes. Dkt. 8

---

[10] Following the Supreme Court's decision, it appears that the *Jennings* litigation (now captioned *Rodriguez et al. v. Bondi et al.*, 2:07-cv-03239-TJH-KES (C.D. Cal.)) still has not reached those constitutional issues. *See Rodriguez v. Marin*, 2020 WL 13724475, at *1 (C.D. Cal. May 28, 2020) (setting forth the first thirteen years of the case's "very complex substantive and procedural history"), *rev'd and remanded sub nom. Rodriguez v. Barr,* 2021 WL 4871067 (9th Cir. Oct. 19, 2021).

at 12–16; *see also* 8 U.S.C. § 1225(a)(1) (defining "applicant for admission," in relevant part, as "[a]n alien present in the United States who has not been admitted").[11]  In *Thuraissigiam*, a non-citizen asylum-seeker (Thuraissigiam) was detained "25 yards" into the United States and issued an expedited order of removal.  591 U.S. at 114.  After his asylum claim was deemed non-credible, Thuraissigiam filed a habeas petition, arguing, in part, that his expedited removal and the disposition of his asylum application violated the Due Process Clause.  *Id.* at 114–15.  The Supreme Court held, however, that "an alien in [Thuraissigiam's] position has only those rights regarding admission that Congress has provided by statute," *i.e.*, no constitutional due-process protections.  *Id.* at 140.

Petitioner's situation is unlike Thuraissigiam's in two important respects.  First and foremost, Petitioner does not challenge any part of his actual removal proceedings, which is to say that he does not "challeng[e] any part of the process by which [his] removability will be determined."  *See Jennings*, 583 U.S. at 292–94 (plurality opinion) (concluding that such claims did not "aris[e] from any . . . proceeding brought to remove an alien").  Thus, Petitioner does not purport to invoke any "rights regarding admission."  *Cf. Thuraissigiam*, 591 U.S. at 140; *id.* at 117–18 (quoting the petition's request for, *inter alia*, "a fair procedure to apply for asylum, withholding of removal, and CAT relief").[12]  While detention pending removal proceedings certainly constitutes an "aspect of the deportation process," *Demore v. Kim*, 538 U.S. 510, 523

---

[11] To reiterate, "admission" is a term of art referring to "lawful entry."  *See* 8 U.S.C. § 1101(a)(13)(A).  This is distinct from "entry" generally.  *See, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality.  In the latter instance the Court has recognized additional rights and privileges not extended to those in the former.").

[12] *See also Aguilar v. U.S. Immigr. & Customs Enf't Div.*, 510 F.3d 1, 10–11 (1st Cir. 2007) (distinguishing between claims based directly on removal proceedings and other "wholly collateral" claims based on detention).

(2003), it only collaterally implicates Congress's "sovereign prerogative . . . to decide which aliens to **admit**," *Thuraissigiam*, 591 U.S. at 139 (emphasis added) (quoting *Plasencia*, 459 U.S. at 32).

This matters because that "sovereign prerogative," *id.*, is the basis of the judge-made rule that undergirds *Thuraissigiam* and similar cases—the so-called entry fiction doctrine, whereby a non-citizen physically present in the United States is treated "as if stopped at the border" for purposes of due process, *id.* (quoting *Mezei*, 345 U.S. at 215).[13]  *See generally* Eunice Lee, *The End of Entry Fiction*, 99 N.C. L. Rev. 565 (2021).  The entry fiction doctrine provides an exception to the usual rule that the Fifth Amendment's Due Process Clause applies anywhere within the "geographic borders" of the United States.  *See Zadvydas*, 533 U.S. at 693.  For example, in *Mezei*, a non-citizen (Mezei) was refused entry to the United States upon arrival and detained at Ellis Island pending disposition of his case.  *Mezei*, 345 U.S. at 208.  The Supreme Court held that Mezei's detention at Ellis Island (despite being geographically within the United States) did not "transform[] [his case] into something other than an exclusion proceeding."  *Id.* at 213.  Thus, his status remained that of an "entering alien," without a constitutional right to due process.[14]  *Id.*

Notwithstanding such harsh results, the entry fiction doctrine makes sense in a world where international borders are not crystalline like lines on a map.  Realistically, the "25 yards" at issue in *Thuraissigiam* was the functional equivalent of a cartographic rounding error, to which the Supreme Court declined to grant constitutional significance.  *See Thuraissigiam*, 591 U.S. at 140

---

[13] *Thuraissigiam* also cites *Leng May Ma*, 357 U.S. at 188–90, and *Kaplan v. Tod*, 267 U.S. 228, 230–31 (1925).  591 U.S. at 139.  However, each of those cases focused primarily on issues of statutory construction.  *See Leng May Ma*, 357 U.S. at 187 ("The question, therefore, is wholly one of statutory construction."); *Kaplan*, 267 U.S. at 258 ("She never has been dwelling in the United States within the meaning of the Act.").  Thus, the Court focuses on the constitutional holdings of *Thuraissigiam* and *Mezei*.

[14] Mezei was "barred from entry on security grounds," seemingly because of his connections "behind the Iron Curtain."  *See Mezei*, 345 U.S. at 214, 216.  After being excluded, and despite substantial efforts, it happened that no other country was willing to take him.  Thus, Mezei was effectively trapped at the threshold, stateless.  *Id.* at 209 ("In short, respondent sat on Ellis Island because this country shut him out and others were unwilling to take him in.").

("[A]n alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.'").  Likewise, the *Mezei* Court recognized the practical necessity of permitting ships' "temporary harborage" at a place like Ellis Island—notably, the quintessential liminal space in American immigration history—without conceding Congress's right to exclude.  *See Mezei*, 345 U.S. at 215.  Thus, by way of only minor operation on the operative facts, the doctrine has preserved Congress's plenary power over immigration in a world without bright lines.

But this raises the second major difference between Petitioner's case and that of *Thuraissigiam* (or *Mezei*).  Petitioner was not 25 yards over the border; nor was he maintained in an immigration processing center.[15]  Petitioner lived with relative freedom in the United States for nearly four years, finding his way across the country from Texas to Massachusetts.  *See* Dkt. 8-1 ¶¶ 7, 16–17.  To claim that Petitioner was never really "here" thus requires a much greater sleight of hand than is provided for in those prior cases.

That lawful fib is made all the more suspect by the rights that it effectively withdraws.  It is well-settled that the Due Process Clause grants protection to "all persons within the territory of the United States."  *Wong Wing v. United States*, 163 U.S. 228, 238 (1896).  Thus, to erase Petitioner's presence in this country is, in essence, to erase his rights.  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.").  In the case of revoked parole into the United States, that may happen by

---

[15] *Cf. Amanullah v. Nelson*, 811 F.2d 1, 8–9 (1st Cir. 1987) (holding that asylum seekers detained upon arrival could not challenge the denial of parole on constitutional due-process grounds).

operation of statute.[16]   But "[l]egislation cannot detract from the privilege afforded by the constitution."   *See Counselman v. Hitchcock*, 142 U.S. 547, 565 (1892), *overruled on other grounds by Kastigar v. United States*, 406 U.S. 441 (1972).  As the dissenters reasoned in *Jennings*,

> [O]nce we admit to uttering a legal fiction, we highlight, we do not answer, the relevant question: *Why* should we engage in this legal fiction here?
>
> The legal answer to this question is clear.  We cannot here engage in this legal fiction.  No one can claim, nor since the time of slavery has anyone to my knowledge successfully claimed, that persons held within the United States are totally without constitutional protection.   Whatever the fiction, would the Constitution leave the Government free to starve, beat, or lash those held within our boundaries?  If not, then, whatever the fiction, how can the Constitution authorize the Government to imprison arbitrarily those who, whatever we might pretend, are in reality right here in the United States?  The answer is that the Constitution does not authorize arbitrary detention.  And the reason that is so is simple: Freedom from arbitrary detention is as ancient and important a right as any found within the Constitution's boundaries.

583 U.S. at 332 (Breyer, J., dissenting) (emphasis in original).[17]

Granting the relief requested in *Mezei* or *Thuraissigiam*—initial entrance to the United States (*Mezei*) or a more robust process toward admission (*Thuraissigiam*)—might have genuinely "undermine[d] the 'sovereign prerogative' of governing admission to this country."   *See Thuraissigiam*, 591 U.S. at 140 (quoting *Plasencia*, 459 U.S. at 32).  But the same cannot be said with respect to Petitioner, who merely seeks to continue engaging in the same removal proceedings as before, only not from a jail cell.  At the same time, the fiction required to deprive Petitioner of his constitutional protections is severely disproportionate, nowhere in line with the reasonable

---

[16] Constitutional avoidance principles might arguably suggest a reading of section 1182(d)(5)(A) that alleviates concern by "return[ing]" someone in Petitioner's position to a form of custody that provides for bond hearings.   However, the Court is mindful of the Supreme Court's admonition against "layer[ing]" procedural requirements onto statutes to bring them in line with the Constitution.  *See Jennings*, 583 U.S. at 296–97.

[17] The Court notes again that the constitutional analysis of the *Jennings* dissent was not contradicted by the majority.  *See Jennings*, 583 U.S. at 297–98, 306–12 (holding that the constitutional-avoidance canon cannot be used to "rewrite a statute," notwithstanding any "constitutional issue[s]" with that statute); *id.* at 312 (remanding for further consideration of the constitutional arguments).

workings of those prior cases. Indeed, to apply the entry fiction doctrine to a case like Petitioner's is to set aside the plain meaning of the Fifth Amendment altogether. Accordingly, the Court concludes that Petitioner's detention is subject to the Fifth Amendment's due-process protections.

### 2.    Application of the Due Process Clause

That does not end the inquiry, however, because detention during removal proceedings can undoubtedly constitute "a constitutionally valid aspect of the deportation process." *See Demore*, 538 U.S. at 523. Indeed, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 521 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)). For example, in *Demore*, the Supreme Court upheld as constitutional the mandatory detention of "a criminal alien who ha[d] conceded that he [wa]s deportable" for a "limited period," pending the inevitable outcome of his removal proceedings. *Id.* at 531.

*Demore*, however, is readily distinguishable from the instant case. That case concerned detention under section 1226(c), which at the time "mandate[d] detention during removal proceedings for a limited class of deportable aliens—including those convicted of an aggravated felony."[18] *Id.* at 517–18. The *Demore* petitioner himself had already been convicted of at least one such aggravated felony, "following the full procedural protections our criminal justice system offers." *Id.* at 513. In upholding the constitutionality of his detention without an individualized bond hearing, the Supreme Court recognized Congress's "justifiabl[e] concern[s]" with respect to

---

[18] Section 1226 has since been amended by the Laken Riley Act, Pub. L. 119-1, 139 Stat. 3 (2025), which expands mandatory detention to certain non-citizens who are "charged with, . . . arrested for, . . . convicted of, admit[] having committed, or admit[] committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person." *See* 8 U.S.C. § 1226(c)(1)(E)(ii). Thus, for some non-citizens, the expansion eliminates the conviction element for mandatory detention that the *Demore* Court found important in upholding the prior version of the statute. *See Doe v. Moniz*, — F. Supp. 3d —, 2025 WL 2576819, at *8–11 (D. Mass. Sept. 5, 2025) (concluding that *Demore* did not support "detention without due process for an individual who has not been convicted of a crime").

evasion and recidivism for that particular class of imminently deportable, (criminal) non-citizens, concern that Congress backed up with detailed evidence. *Id.* at 513, 518–21. Thus, the *Demore* Court held that Congress, competent to make "'reasonable presumptions and generic rules,'" could provide for a "brief" period of mandatory detention for that "narrow" class.[19] *See id.* at 513, 526 (quoting *Reno v. Flores*, 507 U.S. 292, 313 (1993)).

Here, no similar logic applies. Petitioner has not been convicted of any crime.[20] And Respondents offer no "justifiabl[e] concern[]" that Congress might have sought to address by providing for his unbailable detention.[21] *Cf. id.* at 513. Detention under section 1226(c), as approved in *Demore*, is based on "personal activity," demonstrated by a criminal conviction, that rationally supports at least a prima facie finding of detention's reasonableness in light of apparent removability. *See id.* at 524–25 & n.9.[22] No such presumptions hold in a case, like Petitioner's, where deportability is neither conceded nor obvious and where the only rationale for mandatory

---

[19] The "limited period" of detention that the *Demore* Court considered, 583 U.S. at 526, is a far cry from the current state of asylum proceedings, where millions of cases are pending and where average wait times have historically approached five years and appear to be growing. *See note* 1, *supra*; *Immigration Court Backlog: Overall Down, Asylum Backlog Up*, TRANSACTIONAL RECS. ACCESS CLEARINGHOUSE (Mar. 20, 2025), https://tracreports.org/whatsnew/email.250320.html [https://perma.cc/WBJ9-GFKA]; *cf. Demore*, 538 U.S. at 529 ("[I]n 85% of the cases in which aliens [we]re detained pursuant to § 1226(c), removal proceedings [we]re completed in an average time of *47 days* and a median of *30 days*." (emphases added)).

[20] Petitioner's recent arrests do not appear to qualify him for mandatory detention under section 1226(c), even as expanded under the Laken Riley Act. *See* Dkt. 8-1 ¶¶ 14–15; 8 U.S.C. § 1226(c). At a bail hearing, an immigration judge would have the opportunity to assess whether these charges (or any other relevant factors) warrant detention.

[21] Nor could they really. As discussed above, section 1225 provides generally for detention "for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). However, the years-long process that, in practice, typically follows is a creature of regulation and of discretion. *See* 8 C.F.R. § 208.30(f) ("USCIS has complete discretion to either issue a Form I-862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act, or retain jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii) for further consideration in a hearing pursuant to § 208.9."). Thus, whereas Congress necessarily enacted section 1226 in full view of the proceedings to follow, the same cannot be said of section 1225.

[22] The First Circuit has held that *Demore*'s holding is limited by its assumptions and that, to the extent those assumptions fail, detention under section 1226(c) can still violate the Constitution. *See Reid v. Donelan*, 17 F.4th 1, 7 (1st Cir. 2021) ("First, we adhere to the notion that 'the Due Process Clause imposes some form of "reasonableness" limitation upon the duration of detention . . . under [section 1226(c)].'" (brackets in original) (quoting *Reid v. Donelan*, 819 F.3d 486, 494 (1st Cir. 2016), *opinion withdrawn on reconsideration*, 2018 WL 4000993 (1st Cir. May 11, 2018))).

detention appears to be Respondents' asserted authority to withhold generally available due-process protections based on Petitioner's immigration status.

Without an on-point precedent, the Court turns to the three-part balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976).[23]  *See Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021) (applying the *Mathews* factors to consider a due-process claim as to immigration detention).[24]  "The *Mathews* factors are: (1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens

---

[23] "Nearly all district courts that have considered the issue agree that 'prolonged mandatory detention [under section 1225(b)] pending removal proceedings, without a bond hearing, will—at some point—violate the right to due process.'"  *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1116 (W.D. Wash. 2019) (internal quotation marks omitted) (quoting *Bermudez Paiz v. Decker*, 2018 WL 6928794, at *9 (S.D.N.Y. Dec. 27, 2018)).  Notably, many of these decisions have come in contexts where, unlike here, the non-citizen challenging detention has neither presented a bona fide claim for asylum nor has ever lived freely in the United States.  *See, e.g.*, *id.* at 1108–11.  This makes sense because those courts were largely operating in a world where "individuals," like Petitioner, "deemed to have a 'credible fear' of persecution and thus a significant possibility of being granted asylum were overwhelmingly released," obviating the need for those individuals to pursue due-process challenges.  *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 323 (D.D.C. 2018); *see also id.* at 339–42 (concluding that the Government's departure from its policy of individually assessing asylum-seekers' detention violated the Administrative Procedure Act).

Perhaps a product of that different legal landscape, a number of these courts to previously consider the constitutionality of detention under section 1225(b) have employed a threshold "reasonableness" test for detention based, alternatively, on length of detention or on a set of factors derived from cases primarily addressing detention under section 1226(c).  *See id.* at 1116–17 (collecting cases); *see also id.* at 1106–07 ("Magistrate Judge Theiler considered applying the three-factor test outline[d] in *Mathews*, but correctly declined to do so. . . . [T]he *Mathews* test balances the benefits or burdens of 'additional or substitute procedural safeguards' . . . [but] does not resolve the more fundamental issue of whether any procedure . . . must be provided." (quoting *Mathews*, 424 U.S. at 334)).

Respectfully, the Court considers such an approach inappropriate in a case, like Petitioner's, where a non-citizen is detained for full removal proceedings under section 1229a, with no obvious outcome, particularly where a positive credible-fear finding has already been made.  These facts make irrelevant the "reasonable presumptions" as to deportability and length of detention that the Supreme Court identified in *Demore* and upon which courts have since developed "reasonableness" tests to assess the as-applied constitutionality of detention under section 1226(c).  *See, e.g.*, *Reid*, 819 F.3d at 499–500 (quoting *Demore*, 538 U.S. at 526) (discussing "guideposts for other courts conducting a reasonableness review") (cited in *Banda*, 385 F. Supp. 3d at 1115).  If these "presumptions" are ever relevant in the section 1225(b) detention context, it is not the case here.

[24] *See also Rodrigues De Oliveira v. Joyce*, 2025 WL 1826118, at *6 (D. Me. July 2, 2025) (applying the *Mathews* factors in a case procedurally like Petitioner's and finding a due-process violation, citing *Hernandez-Lara*).

that the additional or substitute procedural requirement would entail.'" *Id.* at 28 (quoting *Mathews*, 424 U.S. at 335).

The private interest at stake here is substantial, arguably the most important one there is. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 695. "The Supreme Court has repeatedly affirmed that '[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" *Hernandez-Lara*, 10 F.4th at 27 (quoting *Salerno*, 481 U.S. at 755). "For this reason, 'civil commitment <u>for any purpose</u> constitutes a significant deprivation of liberty that requires due process protections.'" *Id.* (emphasis in original) (quoting *Addington v. Texas*, 441 U.S. 418, 425). Thus, the first factor weighs heavily in favor of relief.

Likewise, the risk of erroneous deprivation is high. In *Hernandez-Lara*, the First Circuit considered the burdens of proof in immigration bond hearings and found that this factor "weigh[ed] heavily" in a petitioner's favor where lack of access to counsel, difficulty in gathering evidence, language barriers, procedural know-how, and the inherent difficulty in proving a negative all meant that "a detainee often starts out behind the eight ball in a bond proceeding, and the opportunities for prejudicial error abound." *Id.* at 30–32.

Here, Respondents have Petitioner sinking the eight ball on the break. Whereas the *Hernandez-Lara* petitioner at least had some access to a forum (albeit a constitutionally inadequate one), Petitioner has none whatsoever. In the absence of relief, the only mechanism Petitioner has

to test the propriety of his detention is DHS's discretionary authority to grant parole.[25]  *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5 ("The Secretary or his designees may invoke, in the exercise of discretion, the authority under [section 1182(d)(5)(A)] of the Act.").  Of course, that is no real test at all.  Thus, the second factor "weighs heavily" in favor of relief.  *See Hernandez-Lara*, 10 F.4th at 30.

As to the third factor, the Court recognizes that providing Petitioner a bond hearing necessarily entails an "administrative burden[]."[26]  *See Mathews*, 424 U.S. at 335.  That being said, "[c]ourts generally have found that the cost of providing a bond hearing is relatively minimal."[27] *Hilario M.R. v. Warden, Mesa Verde Det. Ctr.*, 2025 WL 1158841, at *9 (E.D. Cal. Apr. 21, 2025) (citing cases).  Respondents have not suggested that a bond hearing would be unduly burdensome—indeed, if there is to be any remedy, it is their preferred outcome.  *See* Dkt. 8 at 17 ("Should this Court find [in Petitioner's favor], the appropriate remedy is remand for a new bond hearing, not to order Petitioner's immediate release.").  On balance, the Court finds that this factor does weigh in Respondents' favor but is substantially outweighed by the liberty interest at stake and the high risk of its arbitrary deprivation.

---

[25] Interestingly, in other litigation, DHS has argued that *habeas itself* is a proper "safety valve" to prevent the unlawful detention of someone in Petitioner's position.  *See, e.g.*, Brief for Appellants at 40, *Padilla v. Immigr. & Customs Enf't*, No. 24-2801 (9th Cir. Aug. 19, 2024), Dkt. 16.1 ("The undisputed legality of § 1225(b)(1)(B)(ii) is underscored, moreover, by two safety valves: the availability of parole and ***individual habeas actions***." (emphasis added)).  In a very limited sense, Petitioner's case might be read to lend some support for that proposition.

[26] The Court further acknowledges that "[t]he prompt execution of removal orders is a legitimate governmental interest, which detention may facilitate."  *Hernandez-Lara*, 10 F.4th at 32 (internal citation omitted). However, this Court echoes the First Circuit's skepticism as to whether there exists any legitimate interest in detention "where a noncitizen is not a flight risk" or a danger to his community.  *See id.*  "What is at stake . . . is not the power of the government to detain noncitizens who may cause harm or flee during removal proceedings, but rather" whether Petitioner has any opportunity to demonstrate, in the first instance, that he is not part of that dangerous or evasive class.  *See id.*

[27] Moreover, this Court's order goes only to Petitioner, rather than any sort of system-wide remedy.

In sum, the Court finds that the *Mathews* factors weigh definitely in favor of relief, that Petitioner's detention without a bond hearing violates his due-process rights, and that a bond hearing is an appropriate and minimally invasive additional procedure to ensure that right.

**III.**    **<u>Conclusion</u>**

For the foregoing reasons, the Petition is GRANTED in part.  The Court ORDERS that Petitioner receive a constitutionally adequate bond hearing to consider the merits of his release.

**So Ordered.**

<div style="margin-left:50%">

/s/ Brian E. Murphy                             
Brian E. Murphy
</div>

Dated:  November 7, 2025                Judge, United States District Court